3-2-2. We'll hear first from Ms. Vazquez. Hello, good morning. Jessica Vazquez representing Sgt. Anthony Edenfield. May it please the court. Sgt. Anthony Edenfield appeals the dismissal of his claims under Title VII and the First Amendment claim against the City of New Orleans following his termination from the New Orleans Police Department. By way of background, Sgt. Edenfield was terminated on December 4, 2020 for a series of social media posts discussing his opinion on criminal activity by rioters after George Floyd's death in the summer of 2020. The posts were made off hours and he did not identify himself as a police officer. We're just talking about an 80-day suspension at this point, right? He was terminated and it was later reversed to 80 days. So, he was originally terminated by the... Well, I know that, but I mean, fine. So, we're talking about a year and a half or something. Correct. Okay. We begin by taking a look at the First Amendment, the timeliness of the First Amendment claim. His term, after his termination in December 4, he appealed immediately to the Civil Service Commission. The Civil Service Commission reversed his termination on January 4, 2022 and found him... He imposed an 80-day suspension. Sgt. Edenfield filed suit December 6, 2022, less than one year from the reversal of the termination. We do not argue against the fact that state law determines the timeliness of a First Amendment claim. We do not argue the fact that a cruel is defined under federal law. What we argue is that the state law of, under Louisiana Civil Code, Article 34-64 applies and interrupted the prescription of the First Amendment claim. Under 34-64, it says, prescription is interrupted when one acknowledges the right of the person against who he has commenced... Well, you did not raise that in the trial court. I did, Your Honor. I did raise... Well, it's not, it's not in the district, in the district court opinion. It was, in the motion to dismiss, it was argued in our opposition. I don't have the record site for that, but we do have it in our opposition to the motion to dismiss that was filed early on. We, I think we qualified it as it was either interrupted or told, if I remember correctly. Or told. Or told, correct. There is an acknowledgement of liability in the civil service decision of January 4th, and I have the record site for that, 235-236, where the commissioners found that the undersigned commissioners find that the penalty of termination is not commensurate with the infraction. To support that argument, we point to an Alabama Fifth Circuit case from 1981, Rubin v. O'Corin. That reviewed an Alabama statute. It was professors who filed an administrative complaint with the grievance committee under a 1983 action. The appellant filed suit in federal court, alleged that her termination abridged her constitutional right to due process. The court held that because Alabama law, you look to Alabama law for the statute of limitations, that federal courts must also apply applicable state rules for tolling the statute of limitations. So we refer to that. Now, the city has proposed the case of Delaware State College v. Ricks in contrast. We do not believe to be, that case to be applicable because it was not a 1983 action. It was a 1981 action, and there's actually a federal . . . All of this is very interesting, but none of those cases were cited in your brief, right? It was not. Those cases did not come up in the original opposition. It was just a tolling argument in the opposition. Yeah, but I'm saying you did not argue all of this on appeal either, right? Yes, it's in our brief. All these cases? Yes, yes, Your Honor. It is in our brief. Well, then I'm proving my ignorance. I'm sorry. Oh, that's okay. You have a lot to review. Well, you know, I guess the other question is whether the city, whether the fact that the penalty was reduced is the same as saying that the city acknowledged that it had mistreated him. That is an interesting argument, but the city doesn't address it in their So we argue 34-64 applies. We don't have a counter to that particular specific argument. They do point to . . . But they're the appellees, so they don't even have to brief anything. That may be the case, but we again point to a similar case, Rubin v. O'Korne, as I stated before, for the proposition that if you were applying the state statute of limitations, you would then also apply the state rules for tolling or interruption, go logically with the state statute of limitations. We do not argue that federal law determines when it is accrued. We understand that. Only that if you're going to apply the state statute, you must then also apply the rest of that section of the statutes or the prescriptive period which discusses tolling and concepts like that. Now, turning to . . . What is the precise holding you want the panel to make? That it was . . . Given all that's transpired, what's the precise holding you want us to make? That the First Amendment claim is still . . . is timely filed and would allow us to reverse the decision of the district court on the motion to dismiss filed by the city. Okay. Going forward, there is a . . . we argue that there was direct evidence of discrimination. We argue both that there was direct evidence of discrimination, but even if there wasn't, we still satisfy the elements under McDonnell versus . . . Oh, my goodness. McDonnell versus . . . Douglas. Douglas, yes. I apologize. For direct evidence, we look to the Wilkinson versus Pinnacle Lodging case. There are obviously very opinionated comments that Sergeant Edenfield posted in one post to an article regarding the rioting. He posts the word trash bee, and in another post, he posts . . . he uses the phrase animals and savages. Now, this comment and the City of New Orleans, through Public Integrity Deputy Superintendent Arlinda Westbrook, concedes that these comments were made on an article that included people of varying races and ethnicities. It wasn't just one race. It wasn't just one ethnicity. It was a multitude of people, and in the Civil Service Commission, Sergeant Edenfield testifies that he was talking about the fact that they were engaging in criminal activities such as looting and things of that. We believe when asked . . . So, you know, isn't the city entitled to say that a police officer should not be posting this kind of comment about lawless and riotous behavior, period? So there's two ways, two arguments I would make there. First, allow us to make that argument under the First Amendment claim, which they found was untimely. We would then defend that this was, again, off hours, did not affect the efficiency of his service. If policemen are allowed in Louisiana to arrest anyone at any time, are they not? I mean, it's a calling. In Texas, you're wearing the badge twenty-four hours a day, no matter where you are or what you're doing. I assume that's true in Louisiana. It's just like judges. If we posted that kind of thing, I presume we would be liable for some kind of censure or discipline. So then the question becomes, was the censure or discipline equally applied? And I'll just fast forward a second to our argument under the four-part test. So we have introduced similarly situated sergeants who are outside of his class that engaged in different behaviors, and they were not terminated. So Sergeant Edenfield was terminated. All of these other people did not get terminated. I'll give you an example. All these other people posted similarly incendiary posts, disparaging language, et cetera, et cetera, that you're telling me that they are similarly situated? So I am going to tell you that they're similarly situated because I'm looking at how the, as the Supreme Court in McDonald v. Santa Fe Trail says, the similitude of the employee violations. And it may turn on the comparable seriousness of the offenses. So I will give you a first example. For Sergeant Dennis Lurie, he was found in violation of Rule 3.1. Sergeant Edenfield was found in violation of Rule 3.41, okay? Sergeant Rule 3, I mean, I'm sorry. Rule 3 is the rule on professionalism, and then there's those various subsections underneath there. Sergeant Lurie at roll calls made the statement, if homosexuals and lesbians weren't effing each other, then we wouldn't have AIDS. He was given a letter of reprimand. This was an in-person roll call with peers around him. So whether that is similar to an off-duty post on Facebook, that is the argument. We believe that there is a similitude of these behaviors that make them similarly situated. They don't have to be identical, but they have to be similarly situated. And there was another comparator that we offered, Sergeant Jimmy Turner, who called Sergeant Hanshi gay and queer in several very colorful and derogatory language towards an LGBT, assuming that Sergeant Hanshi was in the LGBT community. He even touched the back of Sergeant Hanshi's buttocks with his front part. And this egregious instead of fighting for a rule 3 professionalism, he got rule 4 workplace discrimination. My argument is it really doesn't matter what rule section you're under if the seriousness of the behavior is similar. There's also a last comparator that we proposed, Sergeant Quanisha Booker, who was on social media. So this was not in front of people or actually physically touching them. This is a person who posted on Periscope, another social media, and posed as Marcus Williams, under the fake name of Marcus Williams, and posted a person who was nude from the waist up, who had a sleeping disorder. She then, what they call catfished, according to the investigation, a transgender person, and posted a photo of them saying, like mother, like daughter, they love big, and then I'll leave it to your imagination what she said, it's in the record. And it depicted a black female with an object going in her mouth. She also used the words in that post, such as ghetto, ratchet, ASS, thoughts, all of these curse words and language, got a five-day suspension. If I interpret correctly your argument today, you are mostly talking about First Amendment retaliation, not about racial retaliation under Title VII, is that right? That would not be correct. So my argument, I will say maybe. I am talking about First Amendment retaliation as far as the timeliness is. I'm also saying we have a Title VII case here, and it was dismissed on summary judgment. We're asking that the dismissal be reversed. Well, you moved right into the comparators without talking about what is the proof of racial discrimination. So we, and I apologize, I veered off because of some of the questions, but I have two arguments with respect to the Title VII. First, that the comments that were made by Arlinda Westbrook, who was the final person who made the decision on the penalty, that that was direct evidence of discrimination. But I thought she only recommended 80-day suspension. No, she did not. She recommended termination. Well, then I'm really, I'm sorry. It's okay. I'll point you to the record on that, Your Honor. It's a big day today. I'm sorry. It's okay. I understand. I will point you to the termination letter and the 105. That's going to be in the record around 221 and 232. And what you will see is a cover letter from Arlinda Westbrook where she overrides the committee. There was a committee of three women of color in October of 2020 who decided it was not a racial, racist terms, the language used by Sergeant Enfield, although inflammatory. They gave him a five-day suspension. She overturned that and found that he deserved termination. Then it went to Sean Ferguson, who the record would show he did not do his own independent investigation. He used the investigation by Arlinda Westbrook and rubber-stamped it and he was terminated. That termination was later reversed by the Civil Service Commission. I want to touch, since I have just 40 seconds on the cat's paw argument, there was some conflict during the testimony, and I will see if I can point to that really quick, around the record 874, 876, and 946, so you can go back to that. Ferguson said he did not see all the videos posted by Sergeant Enfield. It is clear that Arlinda Westbrook gives her final disposition, and the language of the termination letter is very important because it talks about how Ferguson relied upon that investigation. I'm almost out of minutes, so I'll save the rest for rebuttal, I guess. Can you talk to us about what in the record says this is racial discrimination? That the language that he used was racial discrimination? It would be in the termination letter itself. Now the arguments that I make is that it's actually, what I say is that the fact that Westbrook terminated him, and in her cover letter where she overrides the panel of three, we got testimony at the civil service hearing from her where she says she bases her decision that this is racial language on the fact that she is an African American woman, and so our argument here is well that's direct evidence because you're using your race to determine whether or not these comments are racial discrimination. That's why we cite Wilkinson, because in Wilkinson, the managers didn't specifically address Wilkinson's race, but said Hispanics are cheaper and work faster, so it's like a negative implication, and that's how we tie in our direct evidence argument. But on the First Amendment, we only have to decide the timing. That's correct. That's correct. That's correct. This argument would be separate. This is under the Title VII argument of whether there's cat's paw, whether there's direct evidence, and whether there's a similarly situated comparator. Okay. Thank you. Thank you. You have a chance for rebuttal. Mr. Kamp. May it please the Court. Good morning, Your Honors. My name is Max V. Kamp. I am the counsel for the defendant, Apelli, City of New Orleans. This case is about a classified employee of the New Orleans Police Department who made eight comments on social media over the course of a week in the aftermath of the death of George Floyd at the time of mass protests across the country. Superintendent Sean Ferguson of NOPD determined that these eight comments violated NOPD policy and decided to terminate him. This case was adjudicated up to Louisiana Supreme Court, and each juridical body upheld that Sergeant Enfield's comments violated NOPD policy and impaired the efficient operations of the department. The only issue at hand was what would be the proper punishments that is commensurate with the violation, and that wavered between a termination and what was ultimately decided, a severe 80-day suspension. Now we have before us a First Amendment claim under Section 1983 and a Title VII race-based discrimination claim. As it pertains to the First Amendment claim, the issue before the Court today is when does the cause of action accrue? The Fifth Circuit is clear that federal law controls when a action accrues on a Section 1983 claim, and the Fifth Circuit is also clear that the cause of action accrues when the person knows or should have known of the alleged injury that gave rise to their claim. Nobody's disputing when it accrued. The question is tolling? Okay, I'll get to that, Your Honor. And did they argue tolling in the district court? I don't recall. They did put forth this Civil Code Article 3436. I might be getting the number wrong. But what that is about is if the city acknowledges the person's claim that tolls prescription. But in this case, the city had no notice of a First Amendment claim from Sergeant Edenfield. Sergeant Edenfield appealed his termination. In the course of his appeal of his termination, he did not put forth that his First Amendment rights were abridged. Furthermore, he also did not file a race-based discrimination claim with the New Orleans Civil Service Commission, which has subject matter jurisdiction over a race-based discrimination claim. The New Orleans Civil Service Commission, however, under Jackson v. St. Charles Parish does not have subject matter jurisdiction over a First Amendment claim. But he did not raise that. He did not raise his First Amendment claim until he filed suit until December 6, 2022. So the city had no notice that he was saying his First Amendment rights were abridged. So the city could hardly have acknowledged liability. Exactly. Furthermore, on a Section 1983 claim, there's no need to exhaust administrative remedies before filing it. Sergeant Edenfield was represented by counsel and he could have moved, could have moved forward with his First Amendment claim as soon as he was terminated. That terminated took effect immediately. Even though he had a right to appeal, it was not a suspensive appeal. So on December 5, 2020, Sergeant Edenfield did not have a job with the city of New Orleans. As you know, the statute of limitations in Louisiana is one year. I don't need to, I don't think I need to discuss Alabama law that just is not applicable here whatsoever. And so his First Amendment claim is time barred because he had one year to file and he waited until two years and two years later to file that claim. Moving on to his Title VII race-based discrimination claim, the first thing we have to address is the plaintiff's cat's paw theory, because that comes into our analysis of both direct evidence and circumstantial evidence. As it pertains to direct evidence, direct evidence is evidence that shows discriminatory, excuse me, discriminatory motive on its face and there's no need for inferences or presumptions. So what the cat's paw theory is, the Sergeant Edenfield is arguing that it's not Superintendent Ferguson, who was the head of NOPD at the time and who signed the notice of termination. He's arguing that Superintendent Ferguson was not the decision maker in this situation, but instead it was Deputy Superintendent Orlando Westbrook. However, under deposition, Superintendent Ferguson testified that he came to an independent decision on this matter, that while he did read Deputy Westbrook's recommendation, he also spoke at length in his deposition as to what other documents he reviewed. But most importantly here as to why Superintendent Ferguson made an independent decision. First, he takes ownership, but second, he explains four different reasons how he came to this decision, why Sergeant Edenfield could not remain on the force. And those four things are, first, he was concerned about Sergeant Edenfield's ability to lead his subordinates. And I'd like to remind the Court how this situation came to light. The situation came to light because a subordinate of Sergeant Edenfield, that being Detective Ray L. Johnson, read these comments on Facebook. He found them to be racially found them to be unbecoming of a member of the NOPD, and he reported Sergeant Edenfield. So despite any claims about these issues being private, it was read by a subordinate at work. Second, Sergeant Ferguson was concerned about the ability of Sergeant Edenfield to testify in court on issues he worked on with regard to Brady Giglio. Third, he was concerned about the impact of the morale in the community. We did have at least two community groups who had to meet with NOPD leadership over these comments. And then finally, and most importantly, Superintendent Ferguson was concerned about the advocacy of violence that occurred in three of the eight posts. And these are things that this is a situation that could easily arise in the City of New Orleans that Sergeant Edenfield would be assigned to. So Superintendent Ferguson gave very detailed reasons as to how he made an independent decision. And so I believe that the Sergeant Edenfield's cat's paw theory fails. Now let's look at how that impacts our analysis of direct evidence. As it pertains to direct evidence, the plaintiff does not ascribe any racial animus to Superintendent Ferguson, only to Deputy Westbrook. So looking, but let's just say for the purpose of argument that the cat's paw theory were to be found to be that being the case. The plaintiff puts forth the argument that Deputy Westbrook stated that she felt in her experience as an African-American woman that Sergeant Edenfield's comments of the two words, savages and animals, which were used four times over eight of the social media comments, were derogatory towards African-Americans. Furthermore, Sergeant Edenfield then tries to say that her interpretation of how his comments are derogatory are then evidence of anti-white racial bias towards him. He speculates or presumes that she took his race into account. Furthermore, he presumes that she had some sort of like retaliatory motive because of his race. Excuse me. Direct evidence has to have a discriminatory motive on its face. With that in mind, in order to make the connection of Sergeant Edenfield's argument, you have to use inferences and presumptions. And it's the reliance on those inferences and presumptions that defeats this as being not direct evidence. Furthermore, under Wilson versus Pinnacle, this fails because at no point did Deputy Westbrook make any comments about Westbrook's race, about him being white, or make any comments through a negative implication. She simply says how she felt in her experience. Those comments made her feel. So this is not direct evidence. The plaintiff simply just does not put forth and they fail in that respect. Moving on to circumstantial evidence, again, we have to use the cat's paw theory. Comparators need to be similarly situated. Going back to the cat's paw theory, if the plaintiff were to prevail on their cat's paw theory, that means that the ultimate decision maker of Sergeant Edenfield's discipline of termination was the work of Deputy Westbrook. Now, the Fifth Circuit has held under Lee that you need to have the same supervisor. But if not, if two employees have a different supervisor, they can be similarly situated if the ultimate decision maker is the same person. So if the plaintiff claims, as he does, that the ultimate decision maker in his case is Deputy Westbrook, then all the eight comparators that he put forth, the ultimate decision maker was either Superintendent Ferguson or his predecessor, Superintendent Harrison. The plaintiff does not argue in any of those cases that the true decision maker or the ultimate decision maker was Deputy Westbrook. So by definition, none of those eight people that he put forth would actually be similarly situated because the ultimate decision maker were two different people. Now, if... The cat's paw theory doesn't work like that though, does it? The cat's paw gives it, it's a positive theory to help the person say that person played a role and they were being, they were playing a role. But it doesn't say that we're going to negate the actual ultimate decision maker's past behavior. You use both when you're doing the cat's paw. You don't negate the the final decision maker's work too. Use them both. I don't think, I think it's a little cute to say that the, well, the ultimate decision maker was not the female officer and so therefore there's no comparators. You still, the ultimate decision maker is still Ferguson, but he's using her input and her decision making and doing that. So I don't, I don't think that works. Okay, but Your Honor, my interpretation of the case law is that the person who is, you know, the other person, in this case, Deputy Westbrook, that they had such a substantial influence on Superintendent Ferguson that it was as if it were her decision, not to mention the plaintiff's attorney argued today that he simply rubber stamped it. But, moving on to... I'm assuming, Arguendo, that we would consider the eight comparators. Can you deal with them? Absolutely. So let's say the... The eight comparators argued for violence. Williams argued for violence. Right. So moving on to the circumstantial evidence. So the plaintiff put forth eight different comparators that cover nine different instances. One person had two disciplinary actions. One of the things we have to look at is the ultimate decision maker. Four of those eight ultimate decision makers were disciplined by Superintendent Harrison. So right off the bat, those four people, and that's Howard, Hunter, Turner, and Smith, they cannot be similarly situated because it was a completely different superintendent who imposed their discipline in their cases. Can you talk about Williams, please? Yes, I'm sorry. So getting to Williams, which is really the only person that's possibly even... So Williams arguably mentioned violence when he said, I want to fight, and he also used the phrase bald ass head. However, Officer Williams was talking to someone that he knew, and he was talking to this person for not showing up at a school supply drive. This was a private conversation effectively between two people who knew each other. That is a substantially different situation from a police officer making eight social media comments in the aftermath of a situation that he could easily encounter in his job in which he's advocating violence in three of his eight posts. And that was the superintendent's concern about keeping him on the force. If he's getting triggered by little 30 second videos on Facebook, how is he going to act at a large scale public protest if some people are starting to engage in criminal behavior? The proper response is to arrest people who are engaging in criminal behavior, but instead he's advocating violence against them. And that is just simply not on the same scale as to what Officer Williams did in terms of saying he wanted to fight with somebody for not showing up at a school supply event, someone that he knew. Is it the city's position that for a decision person in the decision-making chain to say, as a black person, I look at something this way can imply a racial point of view? Superintendent Ferguson said that what he was mostly concerned about, I'm going to answer your question, was the violence. What Superintendent Ferguson also testified under is that he did not care what the race of the speaker was. He was concerned about the violence and that's why he decided on termination. Suppose a decision maker said as a white person, and I don't know who that lady further down the chain was racially, but as a white person, I do not regard those terms as exclusively race-based. Could that legitimately be considered a racial, racialized comment? Okay. In this situation, Deputy Westbrook was not talking about Sergeant Edenfield's race. Like in the Wilkinson case that the plaintiff brings up, we had a case, the regional manager of the hotel was talking about how she wanted to replace a white man with workers who are of Hispanic descent. There's just simply no analogous situation with what Deputy Westbrook said about how those comments made her feel. She didn't say those comments made me feel this way because he's white. She just said that in my experience as an African-American, these comments are derogatory towards African-Americans. And therefore, if an African-American police officer had posted the kinds of things that Edenfield did, she'd be just as offended. I don't know. I can't speculate as to how she would feel, but what Superintendent Ferguson said, and he's the person who issued the discipline, is I don't care what the race of the speaker was. I'm concerned about the violence here. Can I ask you a question about the First Amendment again? Absolutely. Did you say, did you say that they didn't argue it? Because I pulled up their brief in the district court. They do argue First Amendment, and they do say what the timing should have been. So I'm a little bit confused. No, what I'm saying is that Sergeant Edenfield did not raise a First Amendment issue in his appeal of his termination, so the city had no notice that he was somehow arguing a First Amendment rights issue. So you're talking about in his civil service appeals. That's what you're talking about. Right. Because that's when he, that's when he knew or should have known that he was injured when he was terminated, and at that point, he had a right to file a Section 1983 claim for First Amendment rights, and he didn't. He didn't file it for two years and two days later, and there was nothing in his appeal of his termination that spoke to having his First Amendment rights. So it's presumably that if you're not final until the appeal, till the termination was made final. Well, if we were to say that's the, well, okay, again, the termination was effective immediately. Why isn't that standard? I think it's when the termination decision is final. Well, in that case, it went all the way to Louisiana Supreme Court, and he actually filed his First Amendment claim and his Title VII claim prior to Louisiana Supreme Court. Why would it be the commission and not any other juridical body? It's Delaware v. Ricks, or Ricks v. Delaware is the Supreme Court case, and at least in the Title VII context, it says the date of the adverse employment action is the date that the cause of action accrues. Yes, and that's when he was, the day he was terminated. Correct. So he could have, Sergeant Edenfield would not have lost his ability to file a Title VII claim at a later date, but by not filing his Section 1983 First Amendment claim within a year from the time he was terminated, he lost his ability to bring that forward. Had he filed his lawsuit before he completed his civil service work, his lawsuit still would have been just pending. Is that right? Right. I mean, his Section 1983 claim, because the New Orleans Civil Service Commission doesn't have jurisdiction over that type of claim. It's a separate, I mean, arguably, his First Amendment rights were abridged when he was fired for. I mean, it was, he argues that there was, he had to exhaust his civil service administrative proceedings before he could file his lawsuit, therefore it's tolled, and then he cites the Civil Code article. I mean, at least that's the way I understand the argument. Right, but, I mean, they're calling it a tolling, but that's not based in law. There's no nexus. There's no evidence that the city had any sort of notice that we, therefore, acknowledged that would allow for a tolling. I understand. I'm just saying whether or not he chose to pursue his civil service commission remedies was not a requirement before he could have filed his lawsuit. Right. He did not need to do that. He could have filed it the next day. So, we just ask that you affirm the district court's rulings. Okay. Thank you, sir. Thank you all very much. Ms. Vasquez. I just want to touch on a few things. As far as the Louisiana Civil Code 3464 argument, they say that we don't believe that the issue of whether there was subject matter jurisdiction is dispositive on whether a claim is interrupted or tolled, because you see that in debt collection cases all the time where someone will send in a payment, and that sending in of the payment restarts the prescription in which to sue someone for . . . That's a whole different animal. You know that. Well, that's the closest thing . . . That's a whole different thought process in the Civil Code dealing with landlord-tenant, and you tell me the case where . . . I mean, invoking some article in the Civil Code in the context of here, I mean, you got to make some argument, but I'm missing the force of how just injecting that automatically means that there's some toll. You haven't cited a case that said that he couldn't have filed his lawsuit when he was notified of termination and that he was precluded from exhausting civil service and all the rest of . . . Those two things could have occurred at the same time. So, my argument is this. If it had been a 1981 case, I would understand that, but 1983 specifically looks to the state statute of prescription. The state statute is one year. And then the logic is . . . I'm sorry, I didn't mean to interrupt. Under Rubin v. O'Koren, they had that same one year for Alabama, and then in Alabama . . . Okay, where's the case that I'm just saying? Twenty-three . . . Article 2315, at least when I went to law school 50 years ago, it was one year. As far as I know, it hadn't changed. He had one year to file his lawsuit. So, where's your case that says he couldn't file his lawsuit when he was aware of termination because he first had to exhaust his civil service remedies? Thus, the period was told. I'm just saying, if the case has said that, I'm going to read it. So, we do also cite Hillard v. Housing for the proposition that you have to go through the Civil Service Commission before you can assert your state cause of action. That one dealt with a workman's cop. You had to finish your civil service before you could file . . . I'm telling you the Supreme Court is held in Delaware v. Ricks or Ricks v. Delaware. Now, maybe that was . . . I doubt that was limited to title. That must have been a title because I had this in another case within the past six months, and accrual is when at the date of the adverse action. We don't argue that. We concede accrual . . . I understand that, but as far as tolling or interruption is concerned, their point is that under 3464, they had to do something that effectively acknowledged that they had erred in taking discipline, and they never did. We argue that they did because . . . But they didn't. They got reversed on the extent of the penalty, not on whether the basis for termination, which was violation of the rules, and he had never argued either First Amendment or racial discrimination, so they couldn't possibly have acknowledged either of those. So the language talks about the civil service decision does address that the punishment is not commensurate with the infraction. That's what they hold, and that's what we say is an acknowledgment that the punishment is wrong because the discrimination is in the punishment that he received. You can argue what you want to, and we will look at it. I appreciate you looking at it. The issue for us is that the punishment itself was not even-handed and was based off of the fact that Sergeant Edenfield was white, so these comments were portrayed to be racial in nature when, in fact, the coast . . . What do you do with the statement? I haven't heard you say. The superintendent, Bergson, said the basis was the violence within the language. None of those other cases you mentioned compared to deal with any kind of potentially incitement of violence. Yes, somebody said something and so on and so forth, so the superintendent made the ultimate decision, correct? So he is the ultimate decision maker, correct. However, I would like to just kind of note that I would like for you to review the 876 of the record because that is Ferguson's testimony during the Civil Service Commission when they ask him, are you the final person that makes the determination on the penalty or the finding, and he says he does not agree with that because the NOPD handbook states he is the agent authority. He represents . . . Who do you say the final decision maker was? I'd say that Ferguson is the final decision maker, but that he rubber-stamped an investigation and a recommendation for a discipline . . . Well, I mean, I heard you say that. I was. You're saying he's the final decision. My question to you, you put those comparatives and we get it, but I'm saying you haven't pushed back on his statement that it's the violence that was part of the post, not just savages, the rest of the language, but the violence with him being an NOPD officer, that that was the ingredient that's not in those others, and I'm still waiting on you to tell me how that isn't a differentiating factor when he says, I don't care what the race . . . Never mind whether to believe that or not, but the point is, he says the differentiation. So, what do you do with . . . That's what the C.O. is to violence. So, I push back this way. First of all, whatever Ferguson testified to in the deposition where he talks about all the ways these comments bother him doesn't negate the fact of what he wrote, and what he wrote, which is on the termination letter itself, says that I reviewed Arlinda Westbrook's cover letter 105, and it says, I approve of the disposition and penalty recommended by Deputy Chief Arlinda Westbrook and concurred with the assessment and rationale. So, then we go look at what that 105 letter says, and that's where it talks about that race played a part in the decision to terminate him, and I don't have it exactly in front of me, but I do think I have the record site. That's all right. I will accept that you responded. Okay. You're an able advocate, passionate as well you should be, and zealously representing the interests that I will be satisfied that you have responded to my question. Thank you, Your Honor. Appreciate your time, everyone. All right. Thank you. We have the case. We will be in recess until 9